JON M. SANDS
Federal Public Defender
District of Arizona
250 N. 7th Ave., Suite 600
Phoenix, Arizona  85007
Telephone: 602-382-2700

ANA LAURA BOTELLO, State Bar #030528
Asst. Federal Public Defender
Attorney for Defendant
ana_botello@fd.org

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>             Plaintiff,<br><br>        vs.<br><br>Luis Fernando Bojorquez-Quinonez,<br><br>             Defendant | No: CR-23-01518-PHX-KML<br><br>**SENTENCING MEMORANDUM AND MOTION FOR DEPARTURE AND/OR VARIANCE** |

The Defendant, Luis Fernando Bojorquez-Quinonez, through counsel, hereby submits this Sentencing Memorandum, and respectfully requests various departures and/or variances to achieve a sentence of Time Served or no more than 12 months and one day, to be followed by three years of supervised release.

                                   Respectfully submitted:

                                   JON M. SANDS
                                   Federal Public Defender

                                    s/Ana Laura Botello
                                   ANA LAURA BOTELLO
                                   Asst. Federal Public Defender

## SENTENCING MEMORANDUM

**1.    Introduction**

Mr. Luis Fernando Bojorquez-Quinonez ("Mr. Bojorquez" or "Luis") is a 24 year-old Mexican young man with zero prior criminal history in the United States or in Mexico. Mr. Bojorquez committed the instant offense in part due to youth and immaturity as he made efforts to become a more independent adult.

**2.    Applicable 3553(A) Sentencing Factors and Grounds For Departure, which the Defendant Requests the Court Consider as Grounds for Granting a Departure and/or Variance.**

The main goal of the punishment is that "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 131 S.Ct. 1229, 1235 (2011) *citing Williams v. New York*, 337 U.S. 241, 247 (1949). To achieve this goal, no limitation shall be placed on the information a sentencing court may consider concerning the defendant's background, character, and conduct. *See Williams*, 337 U.S. at 247; 18 U.S.C. § 3661.

**a. Nature and Circumstances of the Offense and History and Characteristics of the Defendant**

Luis Fernando Bojorquez-Quinonez was only 23-years old and attempting to become an independent adult when he committed the instant offense. Luis was born and raised in Nogales, Sonora on the Mexican side of the border. Since before he was a teenager, Luis enjoyed the privileges of having a border crossing card and

visiting the United States regularly. His parents own a small store in Mexico, and provided Luis a comfortable middle-class life. Luis would help his family with their business when he was living with them in Mexico as a high school and college student pursuing a bachelor's degree. However, after six months of college, it became clear that his parents could not afford to pay his full-tuition. Luis decided he would work and try to save some money for college himself—he worked at a Burger King restaurant in Mexico, but was only making around 400 pesos or the equivalent of $21.72 US Dollars per week. Frustrated with his inability to save on these wages, Luis decided to come work in the United States to save money faster.

For about four years, from the ages of 19 until his visa expired in September of 2022, Luis was working restaurant jobs and/or landscaping jobs in Phoenix to try to save money. Unfortunately, Luis found that life in the United States was also very expensive. To save money, he moved in with his girlfriend (US citizen Karolina De La Rosa) and her family. Mr. Bojorquez would contribute to household expenses, but in four years had not yet saved sufficient money to buy himself a car or to get an apartment for himself and his girlfriend. Until his visitor's visa was about to expire, Luis also tried to visit his family in Mexico.

During his visits home, Luis would sometimes run into some of his classmates from high school. Specifically, one of his former classmates reached out to Luis on social media asking if he knew how to acquire firearms in the United

States. Luis had no experience with firearms at all, but he inquired with some of his acquaintances and found he was able to obtain firearms from private sellers. Luis then also realized that he could supplement his income by buying and selling guns for a couple of hundred dollars more. It was this same acquaintance that later reached out to Luis in October of 2023, asking for a "favor." Luis understood that this "favor" likely had to do with firearms, but also might help him with a couple of hundred dollars—money he desperately needed to make his rent payment as the first of the month was approaching, and he wasn't working enough hours.

The "favor" was that Luis would accompany two individuals, completely unbeknownst to Luis, to purchase an expensive firearm. The former classmate explained that because he did not know these two individuals personally, he wanted Luis to be present to ensure that they did not take off with his money. Having no work that day and needing the money, Luis agreed. The two individuals, coming from Tucson, stopped and picked up Luis at his girlfriend's house, since Luis did not have a car and could not meet them otherwise. Then, the former classmate, though text messages, arranged for Luis, and these two individuals would pick up the cash from another person. With the cash in hand, the three went to meet with the owner of Rocke Guns who was selling them a rifle and ammunition—but from a different location, Mr. Gunz, a Federal Firearms Licensee. Luis sat in the back as the two individuals, and the owner of Rocke Guns, drove separately.

Once parked at Mr. Gunz, Luis remained in the car while the two individuals from Tucson went in to purchase the rifle and ammunition. The two individuals returned to the vehicle with 2,000 rounds of ammunition, but without a rifle, as there had been a hold or "delay status" on releasing the firearm. Luis sent messages to his former classmate in Mexico with the news. His classmate asked the two buyers to void the transaction and have his money returned. Luis informed him that he had not signed up to hold the money or the gun—the two from Tucson were supposed to deliver it to another person. Luis had only agreed to be present for the money exchange. The two individuals left Luis with the ammunition as they went back inside to try to get the cash for the rifle reimbursed without success.

Thereafter, federal agents arrested all three individuals in the parking lot without incident. All three individuals were questioned. Only Luis has been charged for this offense—despite law enforcement's awareness of the names, addresses and identifying information of the other two individuals involved.

Upon information and belief, the two individuals from Tucson were questioned and released by law enforcement because they were U.S. citizens. As of today's filing, nearly 11 months have passed since Mr. Bojorquez' arrest. These other two individuals have not been charged for their roles in the offense. Meanwhile, because of his non-citizen status, Mr. Bojorquez has remained in custody this entire time and has essentially taken full accountability for this offense.

### c. Motion for Departure/Variance Based on Young Age

Mr. Bojorquez-Quinonez committed the offense at the very young age of twenty-three, the same age most young men are finishing their college studies. With Mr. Bojorquez-Quinonez' youth, comes great opportunity for him to reform his character. *Roper v. Simmons*, 543 U.S. 551, 570 (2005) ("from a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed").

Both Mr. Bojorquez-Quinonez's youth and immaturity should be considered when deciding the appropriate sentence. "Youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Miller v. Alabama*, 567 U.S. 460, 476 (2012) *citing to Eddings v. Oklahoma*, 445 U.S. 104, 116 (1982).

Scientists have learned through advances in modern magnetic resonance (MRI) that behavioral and cognitive development continue into emerging adulthood and have determined that brain maturation continues into a person's twenties[1]. "[P]arts of the brain involved in behavior control continue to mature through late adolescence." *Graham v. Florida*, 560 U.S. 48, 68 (2010). The frontal

---

[1] Christine E. Fitch, *Emerging Adulthood and the Criminal Justice System: #Brainnotfullycooked, #Can'tadultyet, #YOLO*, 58 Santa Clara L. Rev. 325, 331 (2018); citing Melissa S. Caulum, *Post Adolescent Brain Development: A Disconnect Between Neuroscience, Emerging Adults, and the Corrections System*, Wis. L. Rev. 729, 731 (2007).

lobes in particular, which is responsible for planning, working memory, and impulse control are not completely developed until twenty-five.[2]

Twenty-three year-old, Luis exhibited immaturity and lack of foresight when he failed to think of the long term consequences of his actions. Luis had been brought up in a household without drugs, violence, or anything that may suggest to him the dangers of firearms or how these firearms could wreak havoc on many Mexican communities. He was not thinking about how buying and selling guns—which most young men see frequently in the most popular video games and in popular culture—create very real dangers. Certainly, Luis was not even thinking of the trouble that he could get in by accompanying the two other individuals.

This was Luis' limited role in the offense—to go with them and make sure they did not run off with his former classmate's money. As a minor participant, Luis did not choose the type of gun of how much ammunition would be purchased. He was not going to transport it to Mexico himself. His only role was to be present, so the others did not take off with his money. Luis could not physically leave if he changed his mind because he had no car and had not driven himself to the gun shop. Based on Mr. Bojorquez' youth and immaturity in the commission of this offense, a downward departure is warranted.

---

[2] Sara B. Johnson et al, *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, 45 J. Adolescent Health 216, 217 (2007).

**d. Request for Variance Based on Lack of Prior Criminal History and Limited Mitigating Role in this Offense**

Mr. Bojorquez has separately filed Objection to his Presentence Report for the reason that he did not receive a reduction for Mitigating Role based on § 3B1.2(b) and a separate reduction for Zero Point Offender pursuant to §4C1.1(a). Should this Court overrule Mr. Bojorquez' objections, he respectfully requests that this Court consider as grounds for a downward variance the same grounds for both of these reductions. To wit, Mr. Bojorquez has no prior criminal history in the United States or in Mexico. Although he made admissions about other sales, the details and corpus of these are unclear so as to impute a criminal history to him.

As to this particular offense, there is zero evidence that he was more than a lookout. There are no text messages between Mr. Bojorquez and his uncharged co-conspirators. He did not set up the offense. He did not know the co-conspirators before they picked him up. There is no evidence that he was a leader, planner or organizer of this offense. Indeed, there is evidence that his former classmate was the one making all of the plans and final decisions.

Based on how little he knew about the scope and structure of what was about to happen, Mr. Bojorquez is also not an average participant. In fact, Mr. Bojorquez' agency and decision-making were limited by his immaturity, poverty, and the fact that he did not have a car. Once these two individuals from Tucson picked him up,

8

he was at their mercy to go wherever they wanted to go and do whatever they wanted to do. Were Mr. Bojorquez to disagree with them, he would have been miles from his Phoenix home in Cave Creek, Arizona—somewhere he had never been.

**e. Request for a Variance Based on Lack of Charges for Co-defendants**

This Court is tasked with ensuring that Mr. Bojorquez receives a sentence that is sufficient and not greater than necessary to achieve the goals of sentencing—to include a sentence that avoids unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. 18 USC § 3553(a)(6). In this case, the two other individuals—who made the plans to come purchase this rifle with Mr. Bojorquez' former classmate before they drove two hours from Tucson to Phoenix have yet to be charged. Arguably, they had much more to do with this offense than Mr. Bojorquez and are not facing justice.

The individuals drove over 150 miles from Tucson, Arizona to pick up Mr. Bojorquez in Phoenix, and later to drive to Cave Creek, Arizona to purchase the rifle and ammunition. These two uncharged individuals also went inside Mr. Gunz and filled out the forms, saying they were the actual purchaser of the firearms. Had things gone according to plan, it was these two individuals who were going to drop off the rifle and ammunition with someone else—not Mr. Bojorquez.

Mr. Bojorquez' sole role in the offense was to accompany them to pick up the cash and ensure that they did not take off with the cash. He was not going to

hold the ammunition and rifle. He even refused to hold the large quantity of cash if they had been successful in cancelling the firearm purchase. Because these two individuals may never be charged, and because this Court must ensure equality of persons regardless of social class, economic condition, or citizenship status, this Court should grant a downward variance to achieve a fair sentence to his similarly-situated and uncharged co-defendants.

**e. Request for a Variance Based on Lack of Bureau of Prisons Programming for Non-citizens and Collateral Consequences for Non-citizens**

In their sentencing memorandum (Doc. 33 at pp. 6-7), the government also notes that Mr. Bojorquez should participate in treatment at the Bureau of Prisons—to include treatment for his use of marijuana. The presentence report writer makes no such recommendation; i.e.. that Mr. Bojorquez participate in the Bureau of Prison's Residential Drug and Alcohol Program, because as a non-citizen he is not eligible for such programming. Mr. Bojorquez is also ineligible for other First Steps Act programming for the same reason. The Bureau of Prisons, in their own judgment, chooses who qualifies for their programming and non-citizens are ineligible. Again, this Court has the power alleviate inequities in how the federal criminal system treats defendants convicted of the same offenses.

In this case, Mr. Bojorquez is already being treated dissimilarly than his uncharged co-defendants because he is a non-citizen. For the same reason, he is

ineligible for nearly all of the programming available at the Bureau of Prisons. As such, he will not be able to get out earlier should he complete certain programming.

Instead, Mr. Bojorquez will most certainly be deported after he completes his sentence. This deportation and the fact he has never illegally *entered* the country makes it unlikely he will recidivate. Furthermore, even if he marries his US citizen girlfriend, he will likely never be able to adjust his status to become a legal permanent resident or citizen of this country because of this very conviction. This Court has wide discretion to consider the collateral consequences, including immigration consequences, that this conviction will bring to Mr. Bojorquez' life.

**3 . Future Plans**

Mr. Bojorquez-Quinonez plans on returning to live with his parents in Nogales, Sonora, Mexico. He hopes that his girlfriend, who will retain her crossing privileges as United States citizen, will visit him in Mexico. However, he fears that she will abandon him once she realizes that he has no future in this country. He hopes to restart his education in Mexico and to put this conviction behind him.

**4. Conclusion**

Sentencing Mr. Bojorquez-Quinonez to Time Served, or in the alternative, a term of no more than 12 months and one day is sufficient but not greater than necessary to achieve the goals of § 3553(a) and promote respect for the law.